Caldwell, C. J.
The complainants in review have assigned numerous errors on this decree. And a question of great importance arises at the outset of the case: Can the court go behind the decree, and examine the proofs in the case ? The Supreme Court of this state has materially departed from the English rule on bills of review, which is that the court will not look behind the facts stated in the decree. The first case •decid0 in this state was Ludlow v. Kidd’s Heirs, 2 Ohio, 381. In that case the decree was gen *6 eral, not setting forth, the facts found. The court held that they could look into all the pleadings and evidence, as if the case were originally before them for decision. The court say: “In bills of review, the practice of this court has been to examine the whole case, and decide as if the matter was open before them, in the same situation as it was when the decree was pronounced. When the facts proved, and principles decided, are not inserted in the decree, a bill of review for error in law would be useless, if this course was not pursued.”
The reason given by the oourt for the departure from the established rule is, that in England and New York, where *that rulo prevails, the practice is to recite in the decree the facts found by the court; whereas our practice is to enter a general decree, without any such recital. ,
In the case of Hey v. Stevens, 15 Ohio, 317, the court limit the acope of the decision, in Ludlow v. Kidd’s Heirs, by using the following language: “ In this state, however, it has been held that the original bill, answers, exhibits, and depositions are open for examination ; but this is only where the decree contains no statement of the facts found.”
In reference to these rules we would remark, and in doing so we merely give our individual opinion, that we are not satisfied with either. As to the English rule, it in most eases will afford a party no remedy whatever for an error that may have been committed in the decision of a cause. The causes that are adjudicated in chancery are generally simple questions of fact. The question of whether a fraud has been committed; a question of intention; whether a mistake has been made, or the like, are those which most frequently occur in chancery practice—cases in which, when the facts are ascertained, the law is plain and obvious. If an error has been committed, there are few cases, indeed, in which it can be reached under this rule. It being the business of the chancellor to pass on the state of fact as well as the law of the case, we do not see why his decision should not be reviewed in reference to one as well as the other. This rule pretends to give a remedy at the same time that it cuts off all the means by which that remedy is likely to be made effectual.
As to the practice established by the decisions in this state, we do not regard it as well founded in reason, or consistent with itself. The facts stated in a decree do not give it any additional legal *7 effect; the operation of the decree is the same, whether the facts on which it is founded bo recited or not. It is then a mere matter of form; and why it should make such a difference in the remedy on review we can not see. If any of the facts found are stated in the decree, the court can not look behind them ; if none are stated, then the whole case is open for investigation, as if on the original trial *of the cause. If the bill of review is permitted at all to a party who feels himself aggrieved by a decree, the whole finding of the chancellor, as well of fact as law, should be passed upon. Whether we are right or not on this point is, however, at present, of but little importance. Our Legislature, as we think, have settled the question. The third section of the act entitled an act to dispense with the copying of papers and for other purposes, 46 Ohio Laws, 90, provides—“ That all the original papers and evidence in the original cause, and the entries made, shall be used on the hearing of said bill of review; and it shall not be necessary for the party to procure a copy of the record of proceedings in the original cause ; nor shall it be necessary to recite in the bill of review any of the facts set forth in the pleadings in the original cause.” Curwen’s Rev. Stat. chap. 861, sec. 3.
This statute is, in terms, clear and explicit that all the original papers and evidence in the original cause shall be used in the trial on review. No exception or qualification whatever is used. It is contended, however, on the part of the defendants in review, that this statute merely intends to provide against the necessity of copies by permitting the originals to be used. It is true it does this, and most effectually. It provides that a short petition merely setting forth the names of the parties, the substance of the decree, and the errors relied on, shall bo sufficient, and that it shall not be necessary to prove the record of the proceedings in the original cause. But why so ? Because it has provided for the use of all the papers as on the original trial. It also enacts that'errors of law and of fact may be assigned at the same time, without any restriction to particular cases, which is clearly inconsistent with the former established rule. The statute appears to us to be perfectly consistent with this construction throughout. It would, we think, be a very strained construction of this statute, in its terms applying equally tó all cases, to confino it to a few particular cases. We think, then, that all the original papers and evidence are before us for adjudication in this case.
*8 *How,' then, stands the decree on the facts of the case? There is no allegation in the hill that the disposition of this stock was made in fraud of creditors. That question has, however, been raised in argument, and it is said that John Creed, from 1816, was always more or less indebted to the bank, and that, therefore, these settlements could not be upheld as against its claims. Numerous authorities have been referred to, illustrative of the rules of law on this subject. These we do not think it necessary to examine. The facts of this case are such that that question can not be legitimately raised. John Creed was a man engaged in very extensive and various business. He was the president of the bank nearly the whole time of its existence. He perhaps all the time had a stock note in the bank, which was renewed from time to time. Sometimes he bad a loan equal to the amount of his stock, sometimes greater, but frequently much less.
As we have before seen, from 1816 to 1837, he was a man of large property, prosperous, and unembarrassed in all his business; able to pay his debts when called for, and did pay them. We have no evidence of any debt being in existence at the time these stock transactions took place that is now held by the bank. The maxim that a man must be just before he is generous, is one that is applied to a debtor in favor of his creditors; but I know of no policy of law that is opposed to a wealthy man being generous, merely because the property which his generosity induces him to give might at some time be needed to pay a future creditor. It would, indeed, be a strange policy that would discountenance the giving by those that are wealthy, of their abundance to those who may stand in need of it. Indeed, there is no more objection against a man, if he be able to do it, giving away his property, than there is to his selling it. It is only where existing creditors are injured by it, or where there is a fraudulent intent as to subsequent creditors, that a gift of property can be objected to. There was nothing of that kind in this case.
The next, and, as we think, the great question in the case, is one of intention. Did John Creed intend his stock as an *advancement or gift to his children and the others to whom it was given ? The rule as to the presumption in such cases is properly laid down by the counsel for the bank, from 2 Haddock’s Chancery, 112; where a person purchases property with his own funds, and places the title in the name of a stranger, the legal pre *9 sumption is that he made such purchase for his own use, and that the property is held in trust for him. But when such purchase and conveyance is made by a man to a member of his own family, the presumption is the other way, and the property is hold to be a gift or advancement. These are, however, mere abstract presumptions that may be rebutted by circumstances or evidence going to show a different intention, and each case has to be determined by the reasonable presumptions arising from all the acts and circumstances connected with it; so that it may happen, that where property is thus purchased and placed in the name of a stranger, the presumption that the law will draw, taking all the circumstances into consideration, will be that the property was intended for and vested absolutely in the person in whose name it was placed. On the other hand, it frequently occurs that property purchased and paid for by the father and placed in the name of a child, even where there is no positive evidence of trust, will be presumed, from the facts connected with it, to be intended for the use of the father, and held in trust for him. Lapse of time, connected with continued acts of recognition of the right of the donee, are always potent and frequently controlling circumstances in determining a question of intention in a case of this kind.
John Creed had the capacity to make a provision of this kind for his family, and he ostensibly did so. He commenced in 1816, by giving to his wife and each of his children $2,000 in stock. As his family increased, he made provision for them all, with one single exception, the reason for which, we think, is satisfactorily explained by the evidence, in the same way, by the purchase of stock, and placing it in their names. The bank and John creed both treated the stock as belonging to the persons in whose names it stood. The children *voted on it, sometimes personally, and sometimes by proxy. The dividends on stock were always placed to their credit on the books of the bank; the certificates of stock were issued in their names by the bank, certifying that each was entitled to the amount of stock that stood in their names; the stock was talked of in the family as belonging to the children, and John Creed so spoke of it to his friends and neighbors. The bank claimed a lien on the stock standing in the name of John M. Creed as late as 1840, for a debt which he owed it. The directors of the bank, who had the best means of knowing, and who were most interested in knowing what was the true state of fact, gave a most specific dec *10 laration in 1841 that the stock was a bona fide advancement to the children. Some facts are, however, relied on by the bank to rebut the conclusions that might be drawn from these transactions. One is that John Creed always drew the dividends on this stock, even after the children had come of age, and some of them were acting for themselves. And another is that John Creed spoke to White, one of the witnesses, about this stock as helping to pay his debts to the bank.
As to the first; the fact that John Creed always drew the dividends on this stock. Unexplained, it is certainly an item of evidence having some weight; but when we reflect that John Creed, as officer of the bank, knew of all its operations when they took place; that lie was a large stockholder himself; would be drawing his own dividends ; that several of these persons lived with him, and some of them resided abroad, we do not think it strange that he should have made a practice of drawing for all of them when he drew for himself. Nor do we consider the fact that he did not give a specific account of the money thus drawn, or pay it over, inconsistent with the idea that it was a provision made for the benefit of his family. This provision, from its very nature, was intended, as such provisions generally are, for fiiture, rather than immediate benefit to the parties for whom it was made. As to the other circumstances of John Creed speaking of this stock to White as a fund that would help *him to pay his debts to the bank: White, between whom and John Creed a long confidential acquaintance had existed, speaks of John Creed as often speaking of this stock as a provision that he had made for his family. He says, on cross-examination, that he once, or perhaps oftener, heard Creed speak of this stock as an item which, with his real estate, would enable him to pay off the bank debt. Now this apparent contradiction in the statements of Creed is all explained, if we suppose that the children were willing at his suggestion, to give up.their stock to relievo him from his embarrassments. And we are not without proof on this subject; for it appears that four of the children did offer to the bank an assignment of their stock as a pledge for their father’s debts, which the bank refused, on the ground that the stock belonged to John Creed. Wo think, in the absence of any apparent motive on the part of John Creed to put his property out of his hands, the most reasonable deduction, from all the facts of the case, would be that *11 his motive in reference to this stock was to make a provision for his family.
It is said, however, that the case stands differently with the Smiths. They were brothers-in-law of John Creed ; he was not legally bound to provide for them, nor is it customary for a man to make provision for those thus related to him. Still, between John Creed and the Smiths, or one of them at least, that relationship was held nearer than it generally is. As has been before stated, this stock was taken in their names in 1816. The Smiths were then boys. James H. Smith had been living with John Creed for about four years, and continued to live with him during his life, with the exception of about two years. During all this time, from 1812 to 1828, no account was ever taken of wages ; but Smith lived and did business for Creed, who supported him. On the death of James H. Smith, in 1830, John Creed took his infant daughter to his house and raised her in his family as his own child. The other Smith, Benjamin, in 1816, was at college, and has been absent from the state for many years.
*These boys were poor. It appears that John Creed administered on the estates of both their father and mother, and that there was not a cent of property that ever came to them from these estates. During the existence of the bank, for nearly thirty years, this stock stood in their names and was treated by the bank as belonging to them; it was taken by Creed cotemporaneously with the stock taken for his wife and children, and must be considered as having been set apart for the same purpose.
But we have been looking at this evidence as if John Creed had no motive in putting his property out of his own name, if he continued the owner. But it is said by the defendants in review that John Creed put the stock in the names of these persons for the purpose of evading the charter of the bank. The charter provides that a stockholder in the bank for the first ten shares of stock shall have one vote for each share, for the next ten one vote for every two shares, and so on, decreasing the vote on each share as the number of shares increases : so that the stock, subdivided as it was, would be entitled to ninety-five votes; whoreas, if it had all stood in the name of John Creed, it would have been entitled to but twenty-eight votes. Now this might be an inducement for John Creed to thus divide his stock. It would, however, be a fraud on the chai'ter of the bank, as well as on the other stockholders. But *12 when the directors and attorneys of the bank, some of them distinguished for their general, as well as their legal knowledge, who were the neighbors of John Creed, were acquainted with his acts and character, and with his pecuniary affairs, who were bound, both in law and conscience, to see that no fraud was committed on the charter of the bank, or its stockholders, were unable, during the whole existence of the bank, to discover that such a fraud was being perpetrated, how can they expect that this court, with its comparatively small means of ascertaining the true facts of the case, can infer such fraud ? It is to be remarked that no new fact has come to light in reference to this matter. But suppose they did know that such a fraud was being ^perpetrated; and then, how stands the matter? Why the bank then acquiesced in the deception and gave its sanction to it in every possible form. Not a book in the bank, scarcely, but contained false entries, covering up and effectuating the fraud. Can the bank now come in and show the fraud, and derive any benefit by such showing? We think not. When the bank has run its course; when John Creed, too, has finished his, and, stripped of all his property, is about lying down to die, it is too late to come in and disclose this fraud, if there bo one, merely for the purpose of wresting from John Creed’s family this small remnant of his once large possessions.
But it is said that, so far as the twenty shares standing in the name of Margaret D. Creed are concerned, the decree must stand, on the ground that the complaints in review are not prejudiced by it. As we have before seen, Margaret D. Creed died in 1823, and no administrator was appointed. She was not represented in this suit; the court had not jurisdiction to decree in reference to this stock, unless on the ground that her children, who were parties, were the persons in interest. From the evidence and parties before the court, the complainants, who are the children of Margaret D. Creed, appear to have an interest in this stock, and are, therefore, prejudiced by the decree. Margaret Creed, the daughter, now Margaret Parks, as is disclosed by the evidence, claims this stock. She is not, however, a party to this suit, and her rights, as against the other children, can not now be considered. It is also claimed that the decree, so far as the stock formerly belonging to John M. Creed is concerned, must stand on account of the assignment to John Creed and his assignment to the bank. The evidence shows that William P. Creed had paid debts for John M. Creed previous *13 to 1840, amounting to over $2,000—more than the amount of the stock; that John. M. Creed assigned to William P. Creed this.stock as an indemnity; that William P. Creed went to the bank and asked to have the stock transferred to his name, and that the cashier refused, on the ground that John M. *Creed was indebted to the bank. John M. Creed afterward, without consideration, transferred this same stock to his father, John Creed, who had full notice of the transfer to William. John Creed had the stock transferred to his name on the books of the bank.
Now the bank had, by the provisions of their charter, a perfect right to hold this stock for any debt that they might have against John M. Creed at the time of the transfer to William. The transfer to William, however, vested in him the title to the stock, subject merely to the bank debt. If the bank was claiming this stock for the debt that existed against John M. Creed at the time of the transfer to William, its claim would be good; but the bank is claiming it under John Creed, senior, for the payment of their claims against him.
The fact that the complainants in review are in default for answer to the supplemental bill, is relied on for sustaining the decree. It is evident that the new charges contained in the supplemental bill did not enter into the decree ; the whole finding and decree of the court are perfectly contradictory to all those charges.
The decree of the Supreme Court will, therefore, be reversed, except as to the fifty shares originally in the name of John Creed, and the four shares in the name of John Manis, and the cause will be remanded to the District Court of Fairfield county for further proceedings.
Thurman, J., having been of counsel, did not sit in this case.